**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**EASTERN DIVISION**

JASON TRAVIS GATEWOOD                                                                PLAINTIFF

V.                                      NO. 2:09CV00178 JTR

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration                                        DEFENDANT

**MEMORANDUM AND ORDER**

**I. Introduction**

Plaintiff, Jason Travis Gatewood, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs (docket entries #10 and #12), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind

might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On July 24, 2006, Plaintiff filed an application for SSI, alleging an onset date of August 1, 1993.[2] (Tr. 89-91). Plaintiff reported that he was disabled due to schizophrenia, mood swings, and a sleep disorder.

After Plaintiff's claims were denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge ("ALJ"). On December 17, 2008, the ALJ conducted an administrative hearing, during which Plaintiff appeared and testified. (Tr. 20-46).

Plaintiff was 28-years old at the time of the hearing,(Tr. 25), and had completed the tenth grade. (Tr. 25). He had past work experience as a "handyman" and "hauling

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

[2] Plaintiff later amended his onset date to October 1, 2007, acknowledging that he had earnings in 2007 at the substantial gainful activity level. (Tr. 287).

firewood for his cousin." (Tr. 12).

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, i.e., an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920. If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920. If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an

adjustment to other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded. *Id.*

In his May 4, 2009 decision (Tr. 10-19), the ALJ found that Plaintiff: (1) had engaged in substantial gainful activity in 2007, after his original alleged onset date and the date of his SSI application; (2) had "severe" impairments consisting of major depressive disorder with psychotic features, bereavement, paranoid schizophrenia, and narcissistic personality disorder, which did not meet a Listing; (3) was not fully credible; (4) had the RFC to perform medium work with certain mental limitations — "[Plaintiff] can understand, remember, and carry out simple job instructions (SVP 2)[3] and make judgments in simple work related situations[;] he is able to respond appropriately to co-workers and supervisors with incidental contact and to minor changes in unusual work routine[;] his work environment must involve no direct dealing with the general public;" (5) could perform his past relevant work as a

---

[3]"Specific Vocational Preparation" ("SVP") is a term of art in the Dictionary of Occupational Titles defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles, Appendix C, page 1009 (4th ed.1991). The SVP 2 incorporated in Plaintiff's RFC is the second-lowest, "[a]nything beyond short demonstration up to and including 1 month." The Social Security Administration corresponds SVP 1 and 2 with unskilled work. *See* Social Security Ruling 00-4p.

caretaker/handyman; and, in the alternative, (6) could perform other jobs (at the light work level) that existed in substantial numbers in the national economy, including work as a motel cleaner, and assembly work. (Tr. 18). Thus, the ALJ concluded that Plaintiff was not disabled. (Tr. 18).

On October 5, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 1-3). Plaintiff then filed his Complaint appealing that decision to this Court. (Docket entry #1).

## II.  Analysis

In Plaintiff's Appeal Brief (docket entry #10 at 9-10), he argues that the ALJ erred: (1) in improperly weighing the evidence of his noncompliance with his medical treatment; (2) in concluding that his condition would improve with taking medication; and (3) in concluding that his prior work record was inconsistent with his subjective complaints.  For the reasons discussed below, the Court concludes that Plaintiff's first argument has merit. However, before addressing this argument, the Court will review the pertinent hearing testimony and medical evidence.

Plaintiff testified that, in 2007, he worked for his cousin in a handyman "jack of all trades" service. (Tr. 25-26). He drove a truck, cut firewood, washed windows, and painted. (Tr. 26). There were no other employees but him, and he never had to

speak with anyone. (tr. 28). In 2007, he earned $12,057 from this job. (Tr. 26).

Plaintiff testified that he had no money for mental health treatment. (Tr. 28). He acknowledged missing numerous appointments at Counseling Services of Eastern Arkansas:

> ALJ: And looking at your medical records it looked like you missed a bunch of appointments over at the counseling center. Is there any reason for this?
>
> PLAINTIFF: Yes, sir. Well, it was like, you know, the way they would schedule my appointments like this, then van come pick me up, the van normally come pick me up. But they said 2:00, they would come like 2:30 or 3:00 and some, and I be mad and frustrated and just feel not like going before I know they screw up and there like that. I just choose not to go. And most of them days I was sick and depressed and didn't get good rest that night.
>
> ALJ: So you were dependant [sic] on the van?
>
> PLAINTIFF: Yes, sir.

(Tr. 28). Plaintiff testified that he was on "Title XX" to get financial aid for his treatment, but that later he was disqualified for missing too many appointments. (Tr. 29).

In a typical day, Plaintiff had difficulty focusing and concentrating. He also had problems with his "nerves." (Tr. 29). Sometimes he had visions and saw things that were not there. (Tr. 30). The last time he had a vision he saw the "body of a period" before him, and a few days earlier he heard voices asking for help. (Tr. 30).

Plaintiff stated he had no friends, and needed help to grocery shop. (Tr. 30-31). He also had headache pain, pain in his neck and legs, and required frequent naps. (Tr. 33-35).

On June 24, 2003, Plaintiff was hospitalized after stating that he planned to kill his wife, her boyfriend, and then himself. (Tr. 152-57). While hospitalized he reported smoking a pack of cigarettes a day, and drinking a 30-pack of beer and a fifth of gin "3 to 4 times per week." (Tr. 152). He also reported smoking marijuana daily. (Tr. 152).

He was released from the hospital, on June 27, 2003, with no suicidal or homicidal ideation. (Tr. 158). He was diagnosed with polysubstance abuse, depressive disorder NOS, adjustment disorder with depressed mood, and a GAF of 61.[4] (Tr. 157). He was instructed to follow up with Counseling Services of Eastern

---

[4] A GAF score between 61 and 70 indicates "mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

A GAF score between 41 and 50 indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, inability to keep a job)."

A GAF score between 31 - 40 indicates "[s]ome impairment in reality testing

Arkansas ("CSEA").  (Tr. 158).

In 2005, Plaintiff began sporadic therapy with psychiatrists and social workers at CSEA.  In various Master Treatment Plan Reviews, Plaintiff received a GAF of 40 to 45, and notations indicate that he missed numerous therapy appointments. (Tr. 188-214).

On February 28, 2006, Dr. Mohammed Al-Taher, a CSEA staff psychiatrist, noted that he was uncomfortable in prescribing Plaintiff any medications or continuing with his long-term care because Plaintiff had not provided urine drug screens as instructed.  (Tr. 199).

On December 16, 2005, Dr. Al-Taher wrote that Plaintiff "was clearly disability seeking and tries his best to 'prove' to me he is sick." (Tr. 200). He "freely admitted" to using marijuana. (Tr. 200). Dr. Al-Taher told Plaintiff that he would need to have three clean drug screens "if he is to expect any further help from me." (Tr. 200). Dr. Al-Taher also wrote that he was "very unclear as to whether [Plaintiff] has a mental illness at this point and [sic] time and I am reluctant to commit on his disability

---

or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."
*See* DSM-IV-TR at 34.

eligibility."  (Tr. 200).

On September 6, 2006, Plaintiff was declared ineligible for CSEA-provided transportation due to his excessive number of missed appointments.  (Tr. 266).

On October 20, 2006, Plaintiff underwent a consultative psychological examination from Charles Spellman, Ph.D.  (Tr. 214-17).  He estimated Plaintiff's IQ to be 71-79, and diagnosed major depressive disorder, narcolepsy, and bereavement.  (Tr. 216).  In Plaintiff's "evaluation of adaptive functioning," he was noted to have good communication "in all areas," no limitations in physical development, and good concentration, persistence, and pace.  (Tr. 216).  In the adaptive functioning areas of "social," and "personal responsibility," Dr. Spellman recited Plaintiff's own subjective account of his social functioning and activities of daily living.  (Tr. 216).  Dr. Spellman answered "yes" to the question "have you clearly identified two or more areas with significant limitations in adaptive functioning?"  (Tr. 217).  Dr. Spellman found that there was no evidence of exaggeration or malingering.  (Tr. 217).

On November 15, 2006, a state agency psychologist reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form.  (Tr. 219-32).  Plaintiff was assessed with mild restrictions in activities of daily living, moderate limitations in social functioning and ability to maintain concentration, persistence and pace, and no episodes of decompensation.  (Tr. 229).  The examiner noted that, in a

recent mental status examination, Plaintiff had been diagnosed with a depressive disorder "with psychotic features." (Tr. 231). According to the examiner, "the psychotic features involve allegations involving primarily atypical visual hallucinations that are quite uncommon in a credible psychiatric population. The claimant alleges seeing 'pink dots,' 'snakes,' and 'pictures popping up.'" (Tr. 231). Plaintiff was assessed to have a mental RFC "to perform work where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete." (Tr. 235).

On October 27, 2006, Plaintiff saw Dr. June Powell, another staff psychiatrist at CSEA. Plaintiff reported being off his medications, and having quit substance abuse. (Tr. 254). He still smoked daily. (Tr. 254). Dr. Powell diagnosed paranoid schizophrenia, "impairment in social, occupational, and other areas," and a GAF of 45 to 50. (Tr. 255).

On December 14, 2006, Plaintiff returned to Dr. Powell and reported not taking the Risperdal that had been prescribed for him in October. (Tr. 252). Dr. Powell diagnosed paranoid schizophrenia, "narcissistic and perhaps other personality disorders;" "impairment in social functioning;" and a GAF of 50 to 55. (Tr. 252). Dr. Powell stressed to Plaintiff the importance of complying with his treatment and taking

his medications. (Tr. 252). She arranged for him to participate in a patient assistance program and to receive medication samples. (Tr. 255). She also discussed with Plaintiff his numerous missed psychotherapy appointments and his need for psychotherapy.[5] (Tr. 255).

On May 17, 2007, Plaintiff saw Dr. Alison Baker, another staff psychiatrist at CSEA. Dr. Baker diagnosed schizoaffective disorder, depressive type, and a GAF of 30. (Tr. 309). She put him on the "Wal-Mart four dollar" program for his depression medication, and samples for his psychotropic medication. (Tr. 309).

On July 26, 2007, Dr. Baker noted that Plaintiff had improved on his psychotropic medications, but that his overall compliance remained poor. (Tr. 306). She diagnosed schizoaffective disorder, "lack of health insurance, access to medical care, financial," and a GAF of 40. (Tr. 306).

On September 6, 2007, Dr. Baker diagnosed "continued poor compliance with medications," schizoaffective disorder, depressive type, "access to medical care, financial, impairments in occupational functioning," and a GAF of 35. (Tr. 304).

On September 21, 2007, Cathie Newell, one of the social workers who saw Plaintiff at CSEA, "confronted" him about his "noncompliance with appointments and

---

[5]Plaintiff missed many of his scheduled CSEA psychiatry appointments in 2007. (Tr. 204-336).

med management." (Tr. 330). According to Ms. Newell, Plaintiff "minimized his responsibility for noncompliance." (Tr. 330). Plaintiff also "verbalized [that he] has a lawyer in getting his disability," and Ms. Newell "assisted [Plaintiff] in completing necessary paperwork and processed items of noncompliance on the application." (Tr. 330). The same day, Ms. Newell completed a form titled "Mental Residual Functional Capacity Questionnaire."[6] She checked boxes indicating that Plaintiff was "unable to meet competitive standards" in remembering work like procedures, maintain regular attendance, sustain an ordinary routine, work in coordination with others, complete a normal workweek and workday, and respond appropriately to changes in a work setting. (Tr. 284). She also wrote that his prognosis was "fair with treatment," and that his GAF was 38. (Tr. 282).

On November 30, 2007, Dr. Baker diagnosed "depressed and psychotic [and] off all medications," "schizoaffective disorder, depressive type, "access to medical care, financial, occupational," and a GAF of 32. (Tr. 315).

It appears that Plaintiff failed to keep any of his CSEA appointments in 2008. A CSEA Master Treatment Plan review noted that Plaintiff's "last compliance with therapy appeared to be motivated by needing help in filling out paperwork for disability, which may imply some malingering." (Tr. 298). On June 16, 2008, it was

---

[6]This form was supplied by Plaintiff's counsel. (Tr. 280-81).

noted that he would "need to attend a DKNA [did not keep appointment] clinic prior to rescheduling."

Plaintiff argues that the ALJ improperly weighed the evidence of his noncompliance with treatment in discounting his credibility. While not cited by either party, the Court notes the Eighth Circuit's recent decision in *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009). In *Pate-Fires*, the claimant, who was diagnosed with schizoaffective disorder and chronic substance abuse, had a history of GAF scores ranging from 10 to 56, and had been assessed to have poor judgment and insight. The ALJ denied her claim in part because of his finding that her "failure to seek regular, frequent treatment and failure to follow the medical treatment recommended by her treating sources significantly undermined her credibility." *Id.* at 945.

On appeal, the Eighth Circuit recognized that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse." *Id.* at 945. While substantial evidence supported the ALJ's finding that the claimant knew that she needed to take her medications, there was a lack of evidence on the "relevant question" of whether the noncompliance was a manifestation of mental illness:

Thus, while there may be substantial evidence to support the ALJ's

13

>finding [claimant] knew she needed to take her medication, this evidence does not resolve the relevant question here: whether her failure or even refusal to follow the prescribed treatment was a manifestation of her schizoaffective or bipolar disorder. In this regard, there is no medical evidence, i.e., a discussion by a doctor or other professional, which indicates [claimant's] noncompliance at any time was a result of something other than her mental illness.

*Id.* at 946. Because there was "overwhelming evidence" that the claimant's noncompliance was attributable to her mental illness, the "ALJ's determination [that claimant's] noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law." *Id.* at 947. The Court remanded for an award of benefits.

In this case, the ALJ noted Plaintiff's well-documented history of noncompliance with his mental health treatment as a reason for discounting his credibility. The ALJ emphasized the 2005 opinion of Dr. Al-Taher, a CSEA psychiatrist, that Plaintiff was "clearly disability seeking," and was "very unclear as to whether he [Plaintiff] has a mental illness at this point and time and I am reluctant to commit on his disability eligibility." (Tr. 13). The ALJ also cited the 2007 notation of Dr. Baker, who attempted to assist Plaintiff in obtaining low-cost or sample medications, as well as a 2008 "Master Treatment Plan" notation that Plaintiff might have been malingering in bringing disability paperwork to the clinic. The ALJ concluded that Plaintiff was "not compliant because he chooses to be noncompliant.

The services are available to him, and he has availed himself of them when he felt like it or when he wanted to document the record for disability purposes." (Tr. 15).

When Dr. Al-Taher opined in 2005 that Plaintiff was "clearly disability seeking," he was also unsure of whether Plaintiff even had a mental illness. However, Plaintiff's subsequent treating psychiatrists, all of whom worked at the same clinic with Dr. Al-Taher, unequivocally diagnosed Plaintiff with mental illness, and consistently assessed GAF scores placing him in the range of having serious or major impairments in social and occupational functioning. This begs the "relevant question" of whether Plaintiff's failure to follow his prescribed treatment was a manifestation of his mental illness. *See Pate-Fires v. Astrue*, 564 F.3d at 936. Based on this record, the ALJ should have obtained an opinion from one of Plaintiff's treating psychiatrists addressing whether Plaintiff's noncompliance with treatment was attributable to his mental illness. His failure to do so seriously undermines his credibility analysis and the way in which he weighed the evidence of Plaintiff's non-compliance with his medical treatment.

### III. Conclusion

For the foregoing reasons, the Court concludes that substantial evidence does not support the ALJ's credibility assessment. On remand, the ALJ should ensure that he obtains medical evidence addressing whether Plaintiff's noncompliance with

treatment is a manifestation of his mental illness. The ALJ should also carefully update the medical record and ensure that he obtains and considers all of the medical evidence to support his RFC assessment.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 8th day of March, 2011.

_____
UNITED STATES MAGISTRATE JUDGE